**QUEETS BAND OF INDIANS, et al.,
Plaintiffs-Appellees,**

**v.**

**The STATE OF WASHINGTON, et al.,
Defendants-Appellants.**

**MUCKLESHOOT INDIAN TRIBE,
Plaintiff-Appellee,**

**v.**

**The STATE OF WASHINGTON, et al.,
Defendants-Appellants.**

**Nos. 83–3644, 83–3646.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 2, 1983.

Withdrawn from Submission
Sept. 2, 1983.

Resubmitted July 24, 1984.

Decided July 17, 1985.

Eugene A. Wright, Circuit Judge, filed dissenting opinion.

Michael P. O'Connell, Colville Confederated Tribes, Nespelem, Wash., for plaintiffs-appellees.

Timothy R. Malone, Asst. Atty. Gen., Olympia, Wash., for defendants-appellants.

Before WRIGHT, SKOPIL and POOLE, Circuit Judges.

SKOPIL, Circuit Judge:

We are asked to decide if the State of Washington's refusal to grant licensing reciprocity to vehicles owned and licensed by two Indian tribes violates the federal Constitution. The district court permanently enjoined the state from enforcing its motor vehicle licensing and registration requirements on vehicles licensed and registered by the tribes, reasoning that each tribe was a "jurisdiction" as defined in Wash.Rev.Code § 46.85.020(2), for the purposes of reciprocal immunity from those requirements as provided in Wash.Rev. Code § 46.85.080.

We certified to the Washington Supreme Court the question of whether the state legislature intended to include Indian tribes as jurisdictions eligible for vehicle registration and licensing reciprocity. *Queets Band of Indians v. State of Washington,* 714 F.2d 1008 (9th Cir.1983). The Washington Supreme Court, in a divided opinion, concluded that the relevant statutes were not intended to include Indian

tribes. *Queets Band of Indians v. State,* 102 Wash.2d 1, 682 P.2d 909, 911–12 (1984). We are bound by the Washington Supreme Court's interpretation of state law. See *Wainwright v. Goode,* 464 U.S. 78, 104 S.Ct. 378, 382, 78 L.Ed.2d 187 (1983) (views of state's highest court regarding state law are binding on federal courts).

The Washington Supreme Court's decision brings into question the constitutionality of the legislation, a question not reached below and thereafter raised but reserved. The tribes contend that the state's refusal to recognize tribally issued license plates is (1) a denial of equal protection; (2) a violation of the commerce clause and (3) prohibited by the supremacy clause. We agree that the tribes' ordinances are sufficiently preemptive under supremacy clause analysis to require the state to extend reciprocity to the tribes.

### FACTS

The Quinault Indian Nation (Queets) and the Muckleshoot Band of Indians (Muckleshoots) are federally recognized Indian tribes that govern reservations in the state of Washington. In 1974 the Queets requested the state to provide license plates for tribal vehicles at the nominal fee charged to state agencies and local governments. The state refused. Thereafter, the Queets adopted its own licensing and registration system. The Muckleshoots enacted their motor vehicle licensing ordinance in 1977.

The tribal license and registration ordinances apply only to tribal vehicles engaged in government services. Their respective license plates are standard size, consecutively numbered and bear identifying tribal legends. Registration is carried on each vehicle with copies on file with the respective tribes and with the Washington Department of Licensing. The tribal ordinances provide for automatic reciprocity within the reservations for vehicles registered and licensed by other jurisdictions if such other jurisdictions afford similar reciprocity.

Washington law generally makes it unlawful for any person to operate a vehicle on a public highway within the state without a valid vehicle license and registration. Wash.Rev.Stat. § 46.16.010. The state's reciprocity statutes provide for recognition of license and registration issued by other jurisdictions provided those licensing authorities grant similar privileges to Washington vehicles. Wash.Rev.Stat. §§ 46.85.-010–110. Other "jurisdictions" is defined to include a "state, territory or possession of the United States, the District of Columbia, the Commonwealth of Puerto Rico, a foreign country and a state or province of a foreign country." Wash.Rev.Stat. § 46.85.-020(2). The definition does not include Indian tribes. *Queets,* 682 P.2d at 911–12.

The Queets brought this action shortly after a tribal garbage truck carrying validly issued tribal plates and operating on a federal highway within the reservation was cited by Washington authorities for not displaying a state license plate. The Muckleshoots filed their action after the state informed the tribe that it would not recognize tribal license plates. The tribes and the state agreed to a preliminary injunction prohibiting the state from interfering with the operation of tribally licensed vehicles. The district court's permanent injunction continues in force.

### STATEMENT OF THE ISSUE

During the long course of litigation between the tribes and the state, various issues were eliminated either by intervening decisions or by stipulation of the parties. The state has agreed that the tribes have licensing authority for on-reservation purposes. The state also dropped its claims that tribal vehicles were subject to state use and excise taxes. The Queets withdrew from consideration their argument that they qualified for the nominal fee license available to local governments. See Wash.Rev.Stat. § 46.16.020. By virtue of the Washington Supreme Court's decision, it has been decided that the state's reciprocity statutes do not extend to Indian

tribes. The remaining issue is the constitutionality of that exclusion.

## DISCUSSION

### A. Tribal Authority.

We begin by determining whether Indian tribes possess the authority to license and register governmental vehicles. If they do not possess such powers, there can be no legitimate claim that the state unconstitutionally denied recognition.

■ It has been long understood that Indian tribes possess inherent sovereign powers. E.g., *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 557, 8 L.Ed. 483 (1832). While we have departed from the broad tribal sovereignty principles of *Worcester,* we continue to accord tribes traditional sovereign powers necessary to regulate internal and social affairs. *United States v. Wheeler,* 435 U.S. 313, 322, 98 S.Ct. 1079, 1085, 55 L.Ed.2d 303 (1978). Present day reservation Indians enjoy the right "to make their own laws and be ruled by them...." *White Mountain Apache Tribe v. Arizona,* 649 F.2d 1274, 1284 n. 11 (9th Cir.1981) (*quoting Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 270, 3 L.Ed.2d 251 (1959)).

■ Whether a particular tribal activity is a legitimate exercise of its sovereign powers depends upon the activity's relationship to traditional tribal self-government or internal relations. *United States v. Montana,* 450 U.S. 544, 564, 101 S.Ct. 1245, 1257, 67 L.Ed.2d 493 (1981). For example, there is no tradition of tribal sovereign power or inherent self-government in favor of liquor regulation by Indians. *Rice v. Rehner,* 463 U.S. 713, 722, 103 S.Ct. 3291, 3298, 77 L.Ed.2d 961 (1983). In contrast, a tribe has the inherent power to impose taxes on non-Indians as a part of its authority to govern and to pay the costs of self-government. *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 137, 102 S.Ct. 894, 901, 71 L.Ed.2d 21 (1982).

■ We conclude that Indian tribes possess the sovereign authority to license and register tribal vehicles. See, e.g., *Red Lake Band of Chippewa Indians v. Minnesota,* 311 Minn. 241, 248 N.W.2d 722, 725 (1976). We have no cause to believe that the tribes have been implicitly divested of that power by virtue of their dependent status. See *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 331, 103 S.Ct. 2378, 2384, 76 L.Ed.2d 611 (1983). In *Crow Tribe of Indians v. Montana,* 650 F.2d 1104, 1110 (9th Cir.1981), amended 665 F.2d 1390, cert. denied, 459 U.S. 916, 103 S.Ct. 230, 74 L.Ed.2d 182 (1982), we recognized that the doctrine of tribal government "specifically prohibits state action that impairs the ability of a tribe to exercise traditional governmental functions such as ... vehicle registration." Moreover, Indian tribes' power to issue license plates has been expressly recognized in at least three states, all of which offer reciprocity to tribal governmental vehicles. See *Red Lake Band of Chippewa, supra* (Minnesota); Ariz.Rev.Stat.Ann. § 28–317 (Arizona); S.D. Codified Laws Ann. § 32–5–42 (South Dakota). See also N.M.A.G. Opinion No. 335 (March 5, 1956) (Navajo Tribe entitled to exempt state licenses).

Our conclusion that the Queets and the Muckleshoots possess the power to issue license plates for their respective tribal vehicles is only a starting point in our analysis. Washington apparently does not dispute the tribes' power to license government vehicles. It concedes that the tribes possess the sole licensing authority within the reservation. The state does contend, however, that it is not obligated to offer reciprocity to tribally licensed vehicles once outside the borders of the reservation and can legitimately require such vehicles to be double licensed. The tribes argue that Washington, by virtue of its reciprocity statutes, is constitutionally required to honor their licensing and registration authorities.

### B. Equal Protection.

■ The equal protection clause of the fourteenth amendment requires that "all persons similarly circumstanced ... be

treated alike." *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 562, 64 L.Ed. 989 (1920). The initial discretion to create classifications rests with the state legislature which must have "substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, ... and that account for limitations on the practical ability of the State to remedy every ill." *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). Thus, in applying the equal protection clause to most forms of state action, our review is limited to determining if the classification at issue bears some fair relationship to a legitimate state interest. *Id.*

■ The tribes argue that a more penetrating review is required because the state's classification, while ostensibly neutral on its face, is nevertheless a racial classification. We agree that racial classifications are subject to more exacting scrutiny and must be justified by a compelling state interest and be necessary to accomplish a legitimate purpose. *Palmore v. Sidoti*, —— U.S. ——, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984). We disagree, however, that the state's classification here is racial.[1]

■ Washington's reciprocity statute on its face creates no racial classification. It does not expressly single out the tribes for special treatment or deny to them benefits accorded others. We do not find that the legislation creates an impermissible racial impact. Drivers of motor vehicles without state registration and license plates are cited not because they are members of Indian tribes, but rather because they have failed to comply with a nondiscriminatory state law. See *Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 469 n. 9, 96 S.Ct. 1634, 1639 n. 9, 48 L.Ed.2d 96 (1976) (describing state vehicle registration fee as applied to reservation Indians as "nondiscriminatory"). The state is not attempting to license Indians who are exercising rights guaranteed by treaty. E.g., *Tulee v. Washington*, 315 U.S. 681, 685, 62 S.Ct. 862, 864, 86 L.Ed. 1115 (1942) (reservation Indians cannot be required to purchase fishing licenses to fish at "usual and accustomed places" provided by treaty). Because we find no racial classification, our review of the state's legislation is limited to determining if it is rational.[2] The tribes bear the burden of proving unconstitutionality under such a review; statutes are presumed to be constitutional. See *Brown v. Maryland*, 25 U.S. (12 Wheat) 419, 436, 6 L.Ed. 678 (1827).

The tribes argue that the state has no rational basis to deny them reciprocity. But the state's reciprocity provisions are directed to nonresidents. Neither the tribes nor the owners and drivers of the vehicles are nonresidents. Washington sought to classify in-state vehicles and to require them to possess state issued registration and licensing. There is nothing irrational about that classification and we conclude that the tribes failed to overcome the presumption of constitutionality accorded to the state's legislation. The state's

---

1. Federal legislation singling out tribal Indians for special treatment has withstood equal protection challenges. E.g., *Washington v. Yakima Indian Nation*, 439 U.S. 463, 500–01, 99 S.Ct. 740, 761–62, 58 L.Ed.2d 740 (1979); *Morton v. Mancari*, 417 U.S. 535, 551–55, 94 S.Ct. 2474, 2483–85, 41 L.Ed.2d 290 (1974). Such regulation of Indian affairs is not based upon impermissible classification, but rather is "rooted in the unique status of Indians as 'a separate people' with their own political institutions." *United States v. Antelope*, 430 U.S. 641, 646, 97 S.Ct. 1395, 1399, 51 L.Ed.2d 701 (1977). The classification is political and not racial. *Mancari*, 417 U.S. at 554, 94 S.Ct. at 2484. But it is this unique legal status of Indian tribes under feder-
al law that permits the federal government to enact otherwise impermissible legislation. The states do not enjoy this same unique relationship with Indian tribes and state discriminatory enactments may not stand unless they are enacted with permission granted by federal legislation. See *Washington v. Yakima Indians*, 439 U.S. at 501, 99 S.Ct. at 761.

2. Because we find that the legislation does not create racial classifications, we reject the tribes' argument that the state violated Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d, which prohibits racial discrimination in the allocation of benefits from programs receiving federal aid.

action here does not violate the equal protection clause.

### C. Commerce Clause.

■ The tribes contend that Washington's refusal to grant them licensing reciprocity is discrimination prohibited by the commerce clause.[3] There is no dispute that the tribes engage in business requiring transportation of goods and tribal officers between tribes, states, and into Canada. A state may violate the "negative implications" of the clause by unduly burdening or discriminating against commerce. *Merrion*, 455 U.S. at 154, 102 S.Ct. at 910 (citing *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981); *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977)). Judicial review is "intended to ensure that States do not disrupt or burden interstate commerce when Congress' power remains unexercised: it protects the free flow of commerce, and thereby safeguards Congress' latent power from encroachment by the several States." *Merrion*, 455 U.S. at 154, 102 S.Ct. at 910.

■ In the absence of federal legislation, a state may rightfully prescribe uniform regulations with respect to its highways for all vehicles including those engaged in interstate commerce. *Hendrick v. Maryland*, 235 U.S. 610, 622, 35 S.Ct. 140, 142, 59 L.Ed. 385 (1915). The state may require registration and licensing of such vehicles and charge reasonable fees. *Id.* Moreover, the state is not automatically barred from applying such laws even if they may significantly touch the political and economic interests of the tribes.[4] *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 157, 100 S.Ct. 2069, 2083, 65 L.Ed.2d 10 (1980) (discussing Indian commerce clause). Only undue discrimination is forbidden. *Id.* Reservation Indians traveling beyond the reservation generally have been held subject to such nondiscriminatory state laws that are otherwise applicable to all citizens of the state. See *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49, 93 S.Ct. 1267, 1270–71, 36 L.Ed.2d 114 (1973) (upholding state tax on tribal off-reservation business). The burden that is placed here on the tribes is not applied in a discriminatory manner; it is applied to all citizens of the state. We conclude that Washington's vehicle registration and licensing requirements as applied to the tribes do not violate the commerce clause.

### D. Supremacy Clause.

We have already determined that the tribes possess the inherent authority to register and license tribally owned vehicles. Both tribes have enacted ordinances that on their face qualify for reciprocity under the state law but for the state's exclusion of tribes as jurisdictions eligible for such treatment. If the codes had been enacted by the federal government, we would instantly find preemption of state law even without the state's reciprocity provisions. See *White Mountain Apache v. Arizona*, 649 F.2d at 1281 (noting the same proposition for hunting and fishing codes). The preemptive powers of the tribes are less evident, however, than those of the federal

---

**3.** The Commerce Clause empowers Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., Art. I § 8, cl. 3. Although written as an affirmative grant of power to Congress to regulate interstate, foreign and Indian commerce, the provision has long been recognized as a self-executing limitation on the powers of states to enact laws imposing substantial burdens on such commerce. *South-Central Timber Development v. Wunnicke*, — U.S. —, 104 S.Ct. 2237, 2240, 81 L.Ed.2d 71 (1984).

**4.** We note that the economic burden on the tribes to comply with the state's registration and licensing laws is apparently not destructive of the tribes' financial abilities to self-govern. In *White Mountain Apache Tribe v. Arizona*, 649 F.2d at 1285 n. 13, we left open the question of whether a state tax or fee which, although valid, may render a tribe destitute should be struck down. In that case, we rejected an Indian tribe's argument that the commerce clause precluded the state's application of nondiscriminatory license requirements to non-Indians on the reservation. *Id.* at 1285.

government. Id. But, the tribes do not seek to nullify state law and replace it with their own codes. The tribes seek only to require the state to recognize their licensing authority through application of the state's reciprocity provisions. Thus, we assume that if the tribes' authority in this area can be said to be sufficient to "preempt" the state's regulatory scheme, it is certainly sufficient to force the state to accord the tribes equality with other licensing jurisdictions. See *Hendrick*, 235 U.S. at 621, 35 S.Ct. at 141 (court assumed that state would not deny equality of treatment in reciprocity licensing to District of Columbia residents).

The fact that the tribes possess the authority to enact their respective vehicle codes is only the beginning of our inquiry. Preemption analysis under the supremacy clause is not controlled by "mechanical or absolute conceptions of state or tribal sovereignty." *Ramah Navajo School Board v. Bureau of Revenue of New Mexico*, 458 U.S. 832, 838, 102 S.Ct. 3394, 3399, 73 L.Ed.2d 1174 (1982) (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980)). The analysis requires a particularized examination of the relevant state, federal, and tribal interests. *Ramah*, 458 U.S. at 838, 102 S.Ct. at 3398. But before examining the relevant interests asserted here, we are compelled to address the state's argument that the Supreme Court has closed the door on the concept of preemptive tribal sovereignty.

### 1. Tribal Sovereignty as a Basis for Preemption

■ Congress has broad powers to regulate reservation Indians. See *Wheeler*, 435 U.S. at 322–323, 98 S.Ct. at 1085–1086. This congressional authority and the quasi-sovereign nature of Indian tribes present two independent but related barriers to the assertion of state authority over tribes. *White Mountain*, 448 U.S. at 142, 100 S.Ct. at 2583. First, state law may be preempted by federal law. See e.g., *McClanahan v. Arizona State Tax Comm'n*, 411 U.S.

164, 173, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973). Second, state law may be found to infringe unlawfully "on the right of reservation Indians to make their own laws and be ruled by them." *Williams v. Lee*, 358 U.S. 217, 220, 79 S.Ct. 269, 271, 3 L.Ed.2d 251 (1959). It is this latter barrier that concerns us here because, aside from the "firm federal policy of promoting tribal self-sufficiency and economic development," *White Mountain*, 448 U.S. at 143, 100 S.Ct. at 2583, there is apparently no federal law which would require us to give broad federal preemptive effect to the tribes' ordinances.

■ This lack of congressional action is not dispositive of the tribes' preemption argument, however, because in the unique area of Indian preemption no express federal statement is necessary. *Crow Tribe*, 650 F.2d at 1109. Nevertheless, the tribes' burden is made heavier by this lack of federal action. The Supreme Court has warned that "the trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal preemption." *McClanahan*, 411 U.S. at 172, 93 S.Ct. at 1262. The Court opined that the extent of preemption in the total absence of federal treaties or legislation is somewhat of a moot question since in almost all instances congressional action has defined the boundaries of state authority over tribes. Id. at n. 8.

In *Washington v. Confederated Tribes of Colville*, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), the Court reviewed a tribal cigarette tax imposed on non-Indian purchasers on the reservation. The Colvilles contended that exercise of their taxing authority ousted the state's power to exact its tax. Id. at 154, 100 S.Ct. at 2589. The Court rejected this argument because it found that the state had not infringed on the right of tribal self-government. Id. at 156, 100 S.Ct. at 2082. "While the Tribes do have an interest in raising revenues for essential governmental programs, that interest is strongest when the revenues are derived from value generated on the reser-

vation by activities involving the Tribes...." Id. at 156–57, 100 S.Ct. at 2082–83. The Court found that the Colvilles were essentially marketing an exemption from state taxes to non-Indians. Id. at 157, 100 S.Ct. at 2083; see also Moe, 425 U.S. at 483, 96 S.Ct. at 1646 (upholding state cigarette tax on Indian smokeshop operators because legal incidence of tax fell on non-Indian purchasers).

The Court's rationale in Colville does not apply to the circumstances here. The tribes are not marketing an exemption to non-Indians or even to reservation members. The exemption sought by the tribal ordinances flows only to the tribal governments' benefit. We consider this a crucial distinction and one that prevents us from applying Colville to this case.[5]

In Moe the Indian tribes had expressly disclaimed any immunity from a nondiscriminatory state vehicle registration fee. Moe, 425 U.S. at 469 n. 9, 96 S.Ct. at 1639 n. 9. Two important distinctions cause us to discount the significance of that concession. First, unlike the tribes here, nothing indicates that the Salish and Kootenai Tribes in Moe had enacted their own vehicle registration and licensing ordinances. Accordingly, there was no basis for a preemption claim. Second, it was clear that the state's registration and licensing regulations were not being applied to the tribe, but to tribal members' vehicles. The tribes here have not challenged the state's authority to require reservation Indians to register and license their vehicles under the

Washington statutes for travel beyond the borders of the reservation.

We conclude from our examination of the Court's decisions that the concept of tribal sovereignty and independence still plays a role in the preemption analysis to the extent that it provides a "backdrop" against which federal policy and interests must be measured. White Mountain, 448 U.S. at 143, 100 S.Ct. at 2583; McClanahan, 411 U.S. at 172, 93 S.Ct. at 1262. The role of inherent tribal sovereignty in preemption analysis is defined by "notions of sovereignty that have developed from historical traditions of tribal independence." Rice v. Rehner, 103 S.Ct. at 3295 (quoting White Mountain, 448 U.S. at 145, 100 S.Ct. at 2584). "When we determine that tradition has recognized a sovereign immunity in favor of the Indians ..., then we usually are reluctant to infer that Congress has authorized the assertion of state authority...." Rice, 103 S.Ct. at 3295. Accordingly we turn to the respective interests of the parties to determine if the tribal ordinances are sufficiently "preemptive" to cause the state to recognize through its reciprocity provision the tribal licensing and registration powers.

## 2. Tribal Interests [6]

■ The tribes offer a number of compelling interests in favor of their position. Their respective tribal vehicles are used in the exercise of various sovereign powers. Tribal law enforcement officers and fisheries management staff travel to off-reservation treaty fishing areas to enforce treaty

---

5. Both Colville and Moe also involved state taxes on vehicles owned by reservation Indians. In Moe the Court held that Montana's personal property tax could not be applied to vehicles owned by tribal members who resided on the reservation. Moe, 425 U.S. at 480–81, 96 S.Ct. at 1644–45. In Colville the Court struck down a vehicle "excise tax" because it was not apportioned between on and off reservation use. Colville, 447 U.S. at 163–64, 100 S.Ct. at 2086–87. The Court left open, however, the possibility of a different result had the state tailored its tax to the amount of actual off-reservation use. Id.

6. Ordinarily, federal and tribal preemptive interests do not merge. White Mountain Apache,

649 F.2d at 1281. Here, the tribal interests are an outgrowth of the federal policy toward self-determination, self-sufficiency and self-government. See, e.g., Indian Reorganization Act of 1934, 25 U.S.C. §§ 461–479; Indian Financing Act of 1974, 25 U.S.C. §§ 1451–1543; Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. §§ 450–458e. These federal enactments give us an indication of the "firm federal policy of promoting tribal self-sufficiency and economic development." White Mountain, 448 U.S. at 143, 100 S.Ct. at 2583. They do not, however, specifically address the power of tribes to license and register tribal government vehicles.

rights. Tribal officers are obligated to travel beyond the reservation to meet with federal, state, and other tribes' representatives. Other tribal services, including fire protection, forestry management, housing, social services, health care, ambulance, water, sanitation, and garbage collection, require off-reservation travel in tribally owned vehicles. The state does not duplicate these services provided by the tribal governments to both Indians and non-Indians on the reservations.

The tribes contend that imposition of state licensing and registration requirements on the vehicles providing the above services would require reductions in tribal staffs and services. Moreover, a failure to comply with the state's registration and licensing laws could result in the seizure of tribal vehicles and denial of the tribes' abilities to carry out governmental functions. The tribes argue that the state's denial of reciprocity adds impermissible costs, burdens tribal governments, and most important, is not necessary to the accomplishment of the state's interest. The tribes contend that the state's denial of recognition is directly at odds with its express declaration of policy promoting and encouraging the fullest possible use of its highways. Wash.Rev.Stats. § 46.85.010.

### 3. State's Interest

Washington suggests that the number of tribes which might implement similar licensing and registration codes is sufficiently large as to create some undefined burden. We agree that states generally seek to be able to identify readily vehicles traveling within their territories. But nothing in this record indicates that Washington has experienced any problems identifying Queets and Muckleshoot vehicles.

The state also complains that recognition of tribal government vehicles eventually will force the state to recognize tribal licenses issued to reservation members. Although that issue is not before us, we suggest that the tribal interests in licensing governmental vehicles are substantially more compelling than private tribal members' vehicles.

Finally, the state argues that if the tribes are granted reciprocity, Washington's licensing and registration system would operate solely as a "backstop" or "gap-filler." Unless the tribes provide for licensing, the state contends that it is obligated to provide the service, unlike its obligation to sister states. First, we note that Washington law seems to require the state to also act as a "backstop" for sister states. See Wash.Rev.Stats. §§ 46.16.010 and 46.16.030. Second, even assuming the distinction exists, we note the Supreme Court's warning that "[t]ribal reservations are not States, and the differences in the form and nature of their sovereignty make it treacherous to import to one notions of pre-emption that are properly applied to the other." *White Mountain,* 448 U.S. at 143, 100 S.Ct. at 2583. We do not think the fact that some tribes may elect not to license tribal vehicles and instead purchase Washington tags places any undue burden upon the state. See *Wisconsin v. Whitebird,* 110 Wis.2d 250, 329 N.W.2d 218 (Wis.Ct. App.1982) (state may enforce its boat identification code against tribal members when no federal law prohibited application and the tribe had not enacted their own ordinance). Indeed, the state is currently licensing tribal vehicles and seeks to continue to do so.

### 4. Preemptive Effect

■ We conclude that the tribes' exercise of sovereignty in licensing and registering their respective tribal vehicles carries with it sufficient "preemptive" force to require that the state of Washington afford reciprocal recognition. "The principle of tribal self-government, grounded in notions of inherent sovereignty and in congressional policies, seeks an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other." *Colville,* 447 U.S. at 156, 100 S.Ct. at 2590. We believe that we have reached the best accommodation between those interests.

See *County of Vilas v. Chapman,* 122 Wis.2d 211, 361 N.W.2d 699, 702 (1985) ("[i]f within the system of self-government the tribe has enacted laws and exercised governing authority in a given field or regulation, the balancing of interests tips in favor of the tribe").

The Supreme Court of Minnesota reached a similar accommodation in a case with similar circumstances. In *Red Lake Band of Chippewa Indians v. Minnesota,* 311 Minn. 241, 248 N.W.2d 722 (1976), an Indian tribe sought to compel the state to extend reciprocity to tribal vehicle and registration ordinances. The court concluded that adoption of the code was an appropriate exercise of the tribe's powers and that the state was obligated to grant reciprocity. Id., 248 N.W.2d at 725. The court reasoned:

> Apart from the requirements of the Federal Constitution, the State of Minnesota, as a matter of state policy and with due regard for the unique status of the Red Lake Band of Chippewa Indians under the laws of the United States and of this state, should not, in the absence of some compelling state interest, impose burdens upon persons subject to the governing authority of the Red Lake Band when such burdens will undermine the effectiveness of the band's efforts to achieve effective self-government.

> \* \* \* \* \* \*

> The motor vehicle registration ordinance adopted by the Red Lake Band will be rendered ineffective if owners of vehicles subject to its terms are required to have an additional license from the State of Minnesota as a condition for use of Minnesota's highways. Except for the symbolism involved, the motor vehicle licenses issued to the Red Lake reservation would be of little value to the registrants if the State of Minnesota were to refuse to recognize their validity beyond the territorial limitations of the reservation.

*Red Lake Band of Chippewa,* 248 N.W.2d at 727.

## CONCLUSION

The state's refusal to extend reciprocity to the tribes' vehicle licensing and registration authority does not violate either the equal protection or the commerce clauses of the federal Constitution. We hold that the tribes' enactments of such ordinances are sufficiently preemptive of Washington law as to require the state to offer reciprocity in the same manner it offers other governing jurisdictions.

The district court's decision permanently enjoining the state from enforcing its motor vehicle and registration requirements on vehicles properly licensed and registered by the tribes is AFFIRMED.

EUGENE A. WRIGHT, Circuit Judge, dissenting:

The majority concludes that tribal ordinances providing for the licensing of tribal vehicles preempt the state's authority to require state licenses and registration when the vehicles travel off reservation. I dissent because the state motor vehicle licensing scheme is nondiscriminatory and hence may be applied to tribal activities off reservation, including the operation of motor vehicles, absent Congressional action evincing a contrary intent.

The majority notes that "there is apparently no federal law which would require us to give broad federal preemptive effect to the Tribes' ordinances." However, it cites *Crow Tribe of Indians v. Montana,* 650 F.2d 1104, 1109 (9th Cir.1981), *amended* 665 F.2d 1390, *cert. denied,* 459 U.S. 916, 103 S.Ct. 230, 74 L.Ed.2d 182 (1982), for the proposition that in the area of Indian preemption express federal statements are unnecessary. However, both *Crow Tribe* and the case it relied upon, *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980), involved state attempts to exert taxing authority over on reservation activities by non-Indians.

In *White Mountain,* the Court in a footnote to the passage acknowledging that application of state law to on reservation activity may be preempted without express

Congressional statements to that effect said: "In the case of 'Indians going beyond reservation boundaries,' however, a 'non-discriminatory state law' is generally applicable in the absence of 'express federal law to the contrary.'" *Id.*, 448 U.S. at 144 n. 11, 100 S.Ct. at 2584 n. 11 (quoting *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148–149, 93 S.Ct. 1267, 1270–1271, 36 L.Ed.2d 114 (1973)).

Applying the presumption of preemption applicable when a state attempts to enforce its laws on reservation here, ignores the fact "that there is a significant geographical component to tribal sovereignty, a component which remains highly relevant to the pre-emption inquiry...." *White Mountain Apache Tribe,* 448 U.S. at 151, 100 S.Ct. at 2587. The dichotomy between a state's authority to enforce otherwise nondiscriminatory regulations off reservation and on is evidenced by the results in two companion cases decided by the Supreme Court in 1973.

In *Mescalero Apache Tribe v. Jones,* the Court upheld New Mexico's rights to collect a nondiscriminatory gross receipts tax from a ski resort owned and operated by the tribe but located off reservation. However, on the same day, in *McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), the Court held that Arizona's personal income tax was "unlawful as applied to reservation Indians with income derived wholly from reservation sources." *Id.* at 165, 93 S.Ct. at 1259.

What is really at issue here is the authority of the state to require the tribes to purchase state license plates, without a reduced fee, in order to operate tribal vehicles on public highways off reservation. The only significant burden on the tribe is the cost of securing state license plates. *Cf. Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 156, 100 S.Ct. 2069, 2082, 65 L.Ed.2d 10 (1980) (Washington cigarette tax does not infringe rights of tribal sovereignty

merely because its result is to deprive the tribes of revenue).

As the majority notes, "[t]ribal reservations are not States," *infra* p. 1408 (quoting *White Mountain,* 448 U.S. at 143, 100 S.Ct. at 2076). The decision whether to accord tribal licensing schemes the same status as sister states rests with the legislature. While there may be policy arguments in favor of offering reciprocity or providing reduced fee license plates to tribes as other states have done, *see infra* pp. 1403–1404,[1] it is inappropriate for us to substitute our judgment for that of the state's elected representatives.

In the absence of contrary Congressional intent, I would uphold the state's right to apply its nondiscriminatory licensing scheme to tribal vehicles operating off reservation. I dissent.

---

1. Of the states noted by the majority, only Minnesota offers reciprocity. The others register and license tribal vehicles through the state for a reduced fee or at no charge.