### PRAIRIE BAND OF POTAWATOMI INDIANS, Plaintiff,

v.

### Joan WAGNON, Secretary of Revenue, State of Kansas; Sheila Walker, Director of Vehicles, State of Kansas; and William Seck, Superintendent, Kansas Highway Patrol, State of Kansas, in their official capacities,[1] Defendants.

#### No. 99–4136–JAR.

United States District Court,
D. Kansas.

Aug. 6, 2003.

---

**1.** Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Ms. Wagnon is substituted for her predecessor Stephen Richards and Mr. Seck is substituted for his predecessor, Don Brownlee.

David Prager, III, Mayetta, KS, for Plaintiff.

Brian R. Johnson, The Law Offices of John M. Knox, Chartered, Lawrence, KS, John Michael Hale, Richard L. Cram, Kansas Department of Revenue–Topeka, Gail E. Bright, M.J. Willoughby, Office of Attorney General, Topeka, KS, for Defendants.

**MEMORANDUM AND ORDER GRANTING PLAINTIFF'S MO- TION FOR SUMMARY JUDG- MENT DENYING DEFENDANTS' MOTION TO DISMISS, DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND DE- NYING DEFENDANTS' MOTION TO STRIKE**

ROBINSON, District Judge.

This matter is before the Court on defendants' motion to dismiss (Doc. 144), motion for summary judgment (Doc. 146), and motion to strike (Doc. 161), and on plaintiff's motion for summary judgment (Doc. 154). The parties have filed the appropriate responses and replies to the above motions. The Court has reviewed the parties' filings and is now prepared to rule.

## I. BACKGROUND

### A. Procedural Background

Plaintiff filed its original complaint on September 14, 1999, seeking an order from the Court requiring the State to grant recognition to motor vehicle registrations and titles issued by the Prairie Band of Potawatomi Indians (hereinafter "Nation" or "plaintiff").[2] Thereafter, on October 13, 1999, the Court issued a preliminary injunction enjoining defendants from applying or enforcing the Kansas motor vehicle registration or titling laws against plaintiff and any persons who operate or own a vehicle registered or titled under plaintiff's registration code.[3] Defendants sought a stay of the injunction pending their appeal to the Tenth Circuit. The Court denied the request. However, on November 12, 1999, the Tenth Circuit granted defendants' requested stay.

Finally in an opinion dated June 25, 2001, the Tenth Circuit affirmed the Court's injunction.[4] In the interim, on September 25, 2000, United States Magistrate Judge James P. O'Hara granted plaintiff's request to amend its complaint. (Doc. 84). Plaintiff's Amended Complaint (Doc. 85) is, therefore, the controlling complaint in this matter. Also in the interim, defendant Brownlee[5] filed a motion to dismiss (Doc. 67), and plaintiff filed a motion for summary judgment (Doc. 48). In light of the Tenth Circuit's decision in *Prairie Band,* plaintiff withdrew its motion for summary judgment.

Because the issues raised in defendant Brownlee's motion to dismiss were raised before the Tenth Circuit and rejected, this

---

**2.** The case was initially assigned to Senior District Judge Dale E. Saffels. The case has since been reassigned to the undersigned district judge.

**3.** *Prairie Band of Potawatomi Indians v. Pierce,* 64 F.Supp.2d 1113 (D.Kan.1999).

**4.** *Prairie Band of Potawatomi Indians v. Pierce ("Prairie Band"),* 253 F.3d 1234 (10th Cir. 2001).

**5.** As noted above, defendant Brownlee has since been replaced by defendant Seck.

Court issued a show cause order on October 24, 2001, asking defendant Brownlee to show cause why his motion to dismiss should not be denied. Defendant Brownlee responded, arguing that the Supreme Court case *Nevada v. Hicks*[6] altered the legal landscape so that the Tenth Circuit's opinion in *Prairie Band* no longer controlled. The Court issued an order on February 8, 2002, rejecting defendant Brownlee's arguments and denying defendant Brownlee's motion (Doc. 100).[7]

After the Court denied defendant Brownlee's motion to dismiss, discovery ensued. Thereafter, defendants filed another motion to dismiss and a motion for summary judgment and plaintiff filed a motion for summary judgment, all of which are the subject of this Memorandum and Order.

### B. Factual Background

Plaintiff is a federally recognized Indian tribe located on its Indian reservation in Jackson County, Kansas. On March 16, 1999, the Nation enacted the Prairie Band Motor Vehicle Code ("PBMVC").[8] According to the PBMVC, it was enacted to "implement rules, regulations, and penalties essential to maintaining a safe and efficient transportation system" within the boundaries of the Nation's jurisdiction.[9] The PBMVC states that:

> [T]he issuance of motor vehicle license plates and registration title certificates within the boundaries of the Reservation is necessary in order for the Tribe to be able to control and regulate the ever-increasing amount of motor vehicle traffic on the reservation.

. . . . .

It is also the purpose of the Nation in enacting this Chapter to provide for the orderly registration and licensing of vehicles owned by tribal members and located on the public roads and highways of the Nation's reservation, to assist law enforcement in identifying the owners of such vehicles, to prevent fraudulent transfers, theft, conversion, or other wrongful transactions or use of vehicles, to provide positive identification of vehicles within the service area in cases of emergency, to provide revenue to the Nation through taxation and the levying of fees and charges for the privilege of operating vehicles within the service area, to allow for the orderly transfer of title and other commercial transactions involving vehicles, including the giving of security to secure loans or other advances, and for other purposes.

In accordance with the above stated purposes, the PBMVC requires tribal registrations and titles for all vehicles owned by the Nation and for all vehicles owned by tribal members residing on the reservation. Additionally, the code requires those seeking tribal registrations to surrender any certificate of title issued by another jurisdiction, including those issued by the State of Kansas.

According to the Motor Vehicle Registrar for the Nation, Mickey Martinez, the tribal certificates of title are of banknote quality and resemble titles of other jurisdictions.[10] Also, according to Martinez, the tribal license plates conform to the national standards for visibility design and size.[11]

At present, three vehicles have been issued tribal registrations and titles. One of

---

**6.** 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001).

**7.** *Prairie Band of Potawatomi Indians v. Richards*, No. 99–4136, 2002 WL 215996 (D.Kan. 2002).

**8.** PBMVC § 17–1 to 17–10–48.

**9.** Pl.Ex. 2.

**10.** Martinez Aff. ¶ 2.

**11.** *Id.*

these vehicles is owned by an individual tribal member and the remaining two are owned by the Nation's government.[12] Plaintiff estimates that there will be approximately 300 to 400 vehicles registered and titled under the PBMVC if the Nation is allowed to proceed with its titling and registration system.

Because the reservation does not have some necessary facilities, such as service or repair facilities for vehicles and health-care facilities, occasionally it is necessary for privately owned or tribally owned vehicles to leave the reservation. Additionally, it is necessary for the tribally owned vehicles to leave the reservation to perform government functions such as storm spotting and tornado detection.[13] Absent the preliminary injunction imposed by this Court, drivers of tribally licensed and registered vehicles leaving the reservation would be in violation of state law for failure to present a properly registered vehicle, resulting in ticketing or possible seizure.

State law requires all vehicles that operate within Kansas to have registrations and titles issued by the State.[14] Kansas Statutes Annotated § 8–142 makes the following acts unlawful:

> First: To operate, or for the owner thereof knowingly to permit the operation, upon a highway of any vehicle ... which is not registered, or for which a certificate of title has not been issued or which does not have attached thereto and displayed thereon the license plate or plates assigned thereto by the [applicable state division].
>
> Second: To display or cause to permit to be displayed, or to have in possession, any registration · receipt, certificate of title, registration license plate, registration decal ... knowing the same to be fictitious or to have been canceled, revoked, suspended or altered.

The named defendants have either taken the position or are enforcing the position that plaintiff's tribal registrations and titles violate the above statute when used off-reservation. Because the State does not regard registrations and titles issued by the Nation as valid, three citations have been issued by the State pursuant to Kansas Statutes Annotated § 8–142 for persons driving tribally-registered vehicles off the reservation.[15]

Pursuant to Kansas Statutes Annotated § 75–4302 the Director of Vehicles, defendant Walker, is empowered to enter into reciprocity agreements with other "states" regulating the use of vehicles owned by citizens of other states on the highways of Kansas. According to Kansas Statutes Annotated § 74–4305, the term state means, "state, territory or possession of the United States, the District of Columbia, the Commonwealth of Puerto Rico, a foreign country and a state or province of the foreign country ...." In accordance with this supposed wide latitude to recognize other jurisdictions' registrations, the State of Kansas allows the use of all private passenger vehicle registrations and all government passenger vehicle registrations issued by other jurisdictions to non-residents.[16] Additionally, the State authorizes a number of particular vehicle registrations to be issued for local governments, including cities, counties and school districts.[17] The State of Kansas allows vehicles registered by Indian tribes locat-

---

12. *Id.* at ¶ 4.

13. *Id.*

14. *See* Kan. Stat. Ann. § 8–142.

15. *See* Kan. Stat. Ann. § 8–142.

16. Kan. Stat. Ann. § 8–138a.

17. Pl.Ex. 24.

ed in Oklahoma to be driven within the state.[18] And finally, defendants have represented to the Tenth Circuit in the context of this case that if the Nation were a Minnesota tribe, the State would recognize their vehicle registrations.[19]

Often police officers communicate with dispatchers to get information on a vehicle and its occupants before they approach the vehicle.[20] There are several information systems available to police officers regarding a vehicle and its passengers. Police officers have access to the Kansas Criminal Justice Information System ("KCJIS") which provides vehicle registration information through the Department of Motor Vehicle's ("DMV")[21] files. Law enforcement officers use this system to verify that the DMV registration information matches the vehicle that is stopped. Officers also have access to the National Law Enforcement Telecommunications System ("NLETS"). The purpose of NLETS is to provide for the interstate and/or interagency exchange of criminal justice related information. Finally, officers may access information from the National Crime Information Center ("NCIC") which is a computerized index of criminal justice information.

Law enforcement officers go through a two-part safety screening process when they pull over a vehicle.[22] First, when an officer stops a vehicle, he or she checks to see if either the vehicle or the occupants have been entered into the NCIC database. If the vehicle or occupants have not been entered into the NCIC database, that satisfies the first screen for officer safety.[23] Second, if the DMV registration information, retrieved through the KCJIS system, matches the vehicle stopped, then the second screen for officer safety is satisfied.

Registration information for the three vehicles registered pursuant to the PBMVC is not available on the KCJIS system.[24] However, the Nation asserts that all tribal vehicle registrations and titles issued by the Nation, and all pertinent tribal vehicle registration information has been delivered to the State of Kansas and all local law enforcement agencies including the Jackson County Sheriff's office, the Kansas Highway Patrol, the Holton, Kansas police department and the Nation's chief of police. Additionally, registration information for vehicles registered to Indian nations located in Oklahoma is not available to Kansas law enforcement officers for use in the field.

In this case, plaintiff seeks declaratory and injunctive relief requiring the State of Kansas to extend reciprocity privileges throughout the state to plaintiff's tribally-issued vehicle registrations and certificates of title.

### C. Tenth Circuit Opinion

In reviewing this Court's issuance of a preliminary injunction, the Tenth Circuit

---

**18.** *See State v. Wakole,* 265 Kan. 53, 959 P.2d 882 (1998).

**19.** *See* Appellants' Application for Stay, Tenth Circuit Case No. 99–3324; Sheila Walker Deposition (admitting that she would recognize plaintiff's registrations and titles if it was a Minnesota tribe). *See also* Wright and Miller, Federal Practice and Procedure § 2722 (noting the Rule 56(c) permits the court to consider any admissions on file in the pending litigation).

**20.** Warders Aff. ¶ 2.

**21.** The DMV files are maintained by the Department of Revenue.

**22.** Warders Aff. ¶ 2.

**23.** *Id.*

**24.** Based on defendants' statement of facts, it appears that there would be no cause to register a vehicle or an individual under the NCIC system until the individual somehow becomes involved in the criminal justice system.

addressed two major issues: (1) whether this Court had subject matter jurisdiction over the action; and (2) whether this Court abused its discretion in issuing the preliminary injunction.[25] Under the first inquiry, the Tenth Circuit found, contrary to defendants' assertion, that the Court had federal question jurisdiction over the case.[26] In addition, the circuit court found plaintiff presented an Article III case or controversy, plaintiff had sufficient standing to bring the action, and that the *Young* abstention doctrine was inapplicable.[27]

As to the second inquiry, the circuit court found that this Court did not abuse its discretion in issuing the injunction.[28] In reaching this conclusion, the circuit court rejected numerous arguments presented by defendants. Defendants unsuccessfully asserted that: (1) the injunction lacked proper specificity; (2) the Court applied the wrong standard in issuing the preliminary injunction; and (3) the merits of the injunction failed the traditional four-part preliminary injunction standard.[29]

In evaluating whether the district court abused its discretion, the court first found that without the injunction, the Nation would suffer irreparable harm. The court noted that the defendants' actions in enforcing the State's title and registration laws as it applies to those with tribally issued titles and registrations created the "prospect of significant interference with tribal self-government."[30] The court fur-

ther noted that such an inference with tribal self-government could not be compensated via monetary damages not only because valuation of the harm would be difficult but also because the State's Eleventh Amendment sovereign immunity may prevent plaintiff from recovering damages.[31]

In evaluating the second factor for issuing a preliminary injunction—balancing the potential harms—the court determined that the district court did not abuse its discretion by finding the harm to plaintiff's right to tribal self-government outweighed defendants' concern for public safety. The court noted that based on the record it appeared the defendants had exaggerated the safety problem posed by trial registrations and titles given the fact that Kansas recognizes the registrations and titles of tribes residing outside the state. Additionally, the court rejected defendants' arguments regarding state sovereignty, finding that "[f]ederal Indian law is replete with examples in which state law has had to accommodate tribal sovereignty."[32]

Discussing the third prong of the preliminary injunction analysis—public interest—the court noted that under Tenth Circuit case law, tribal self-government may be a matter of public interest.[33] In addition, the court once again noted that the defendants' asserted public interest, public safety, was "not as portentous as the defendants would have it . . . ."[34]

25. *Prairie Band,* 253 F.3d at 1239.

26. *Id.* at 1239–40.

27. *Id.* at 1240–42.

28. *Id.* at 1242–57.

29. *Id.*

30. *Id.* at 1250 (citing *Seneca–Cayuga Tribe of Oklahoma v. Oklahoma,* 874 F.2d 709, 716 (10th Cir.1989)).

31. *Id. See also A.O. Smith Corp. v. F.T.C.,* 530 F.2d 515, 525 (3d Cir.1976) (noting the irrep-

arable harm is often suffered when "the injury can [not] be adequately atoned for in money . . . .")

32. *Prairie Band,* 253 F.3d at 1252 (citing Felix S. Cohen, Handbook of Federal Indian Law 234 (1982 ed.)).

33. *Id.* at 1253 (citing *Seneca–Cayuga,* 874 F.2d at 716).

34. *Id.*

■ Finally, the court focused the bulk of its analysis on the fourth prong of the preliminary injunction test, whether there were questions going to the merits that are "so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." [35] In determining there were serious issues for litigation, the court noted that the doctrine of federal preemption and/or the doctrine of Indian sovereignty are possible barriers to defendants' assertions of authority regarding motor vehicle registration and titling.[36] The court questioned defendants' assertion that the above doctrines only apply to activity on reservation land, finding that the court must balance the tribal, federal, and state interests when conducting the preemption analysis.

With the road map drawn by the Tenth Circuit, the Court will proceed in deciding the motions currently before the Court.

## II. STANDARDS OF REVIEW

### A. Motion to Dismiss

■ In ruling on a motion to dismiss, the Court accepts the veracity of all well-pleaded facts in the plaintiff's complaint and views both the facts and all reasonable inferences in the light most favorable to the plaintiff.[37] The pleadings must be construed liberally.[38] In a Rule 12(b)(1) motion, the Court may consider documents and other information submitted to the Court in addition to the plaintiff's complaint.[39]

### B. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and the admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." [40] There is a "genuine" issue of material fact if a reasonable jury could return a verdict for the nonmoving party.[41] Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." [42]

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. This may be met by showing that there is a lack of evidence to support the nonmoving party's case.[43] Once the moving party properly supports its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial.[44] "A party opposing a properly supported motion for summary

---

**35.** *Id.* (citing *Federal Lands Legal Consortium v. United States,* 195 F.3d 1190, 1194 (10th Cir.1999)). The traditional fourth prong is whether the party seeking the injunction has a substantial likelihood of success on the merits. But, when the party sufficiently demonstrates the first three factors, the less stringent standard, discussed above is controlling.

**36.** *Id.* at 1254.

**37.** *Housing Authority of Kaw Tribe v. City of Ponca City,* 952 F.2d 1183, 1187 (10th Cir. 1991); *Swanson v. Bixler,* 750 F.2d 810, 813 (10th Cir.1984).

**38.** *Gas–A–Car, Inc. v. American Petrofina, Inc.,* 484 F.2d 1102, 1107 (10th Cir.1973).

**39.** *Armstrong v. Goldblatt Tool Co.,* 609 F.Supp. 736, 737 (D.Kan.1985).

**40.** Fed.R.Civ.P. 56(c).

**41.** *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**42.** *Id.* at 251–52, 106 S.Ct. 2505.

**43.** *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**44.** *See Anderson,* 477 U.S. at 256, 106 S.Ct. 2505.

judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." [45] Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.[46] The Court must consider the record in the light most favorable to the nonmoving party.[47]

## III. MOTION TO STRIKE

Instead of adequately responding to the issues presented in plaintiff's motion for summary judgment,[48] defendants have asked the Court to strike almost every single piece of evidence plaintiff presents in support of its motion for summary judgment. The Court largely finds defendants' objections to plaintiff's evidence frivolous. In any event, the Court makes the following findings.

### A. Affidavits

■ Affidavits submitted in support of or in opposition to a motion for summary judgment must "set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matter stated therein." [49] Although the content or the substance of the evidence contained in the affidavit must be admissible, the evidence does not have to be in a *"form* that would be admissible." [50]

■ In general terms, defendants make conclusory allegations that the affidavits presented by plaintiffs are not made on personal knowledge, do not set forth facts that would be admissible in evidence and do not affirmatively show that the affiant is competent to testify to facts contained therein. Additionally, defendants complain that the papers referred to in the affidavits are not directly "attached thereto" the affidavit. Apparently defendants are not satisfied that the papers referred to in the affidavits are attached as exhibits in the record. As a preliminary note, the Court will not exclude the affidavits simply because the papers are not attached directly to the affidavit and are contained in the record as separate exhibits.

■ In addition, because the Court relies on the affidavit of Mickey Martinez, the Court finds it necessary to address some of defendant's objections to her affidavit. First, the Court notes that defendants' complaints regarding the Martinez Affidavit are merely broad assertions with little credibility. For example, in many of their objections defendants simply contend Ms. Martinez did not have personal knowledge of the matters attested to or is not competent to testify to the matters contained therein. The Court finds, thereby eliminating many of defendants' objections, that Ms. Martinez, as tribal motor vehicle registrar and as manager of all tribal vehicles, is competent to testify about matters pertaining to the facilities located on the reservation and thus the necessity of leaving the reservation, matters concerning tribal motor vehicle registration and matters concerning use of government vehicles. Further, any defect in Ms. Martinez'

---

45. *Id.*

46. *See id.*

47. *Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir.1984).

48. By way of explanation, defendants' response to plaintiff's motion for summary judgment contains a ninety-seven page motion to strike and twenty pages of arguments and authorities which are largely non-responsive to issues raised in plaintiff's motion for summary judgment.

49. Fed.R.Civ.P. 56(e).

50. *Thomas v. International Business Machines,* 48 F.3d 478, 485 (10th Cir.1995) (citations and quotations omitted).

initial affidavit concerning her personal knowledge was cured by her supplemental affidavit which states, "[a]ll statements in this affidavit and in my first affidavit ... are made upon my personal knowledge."

■ Additionally, defendants object to some portions of the Martinez affidavit on the basis that statements contained therein are conclusory and non-personalized. Defendants assert that because testimony contained in the affidavit is identical to some of the information contained in Jon Boursaw's affidavit, (Pl.Ex. 33), Martinez is not competent to testify to the facts contained in her affidavit. To the extent defendants are arguing that only one person is competent to testify to a certain set of facts, defendants arguments are rejected.[51]

■ As to defendants' request for an order striking portions of other affidavits contained in the record, defendants' motion is denied as moot because the Court does not rely on any hearsay, legal opinions or conclusions, statements not made on personal knowledge or conclusory statements contained in the above mentioned affidavits.

## B. Documentary Evidence and Statutes

■ Defendants make several objections to plaintiff's documentary evidence on the grounds that the exhibits are not identified, authenticated and swom. With respect to plaintiff's exhibits 7–13, and 19, and 27–30 defendants have waived their objections, other than relevancy, in the Pretrial Order ("PTO") (Doc. 143). Thus, defendants' motion to strike these exhibits is overruled as waived.[52] Additionally, to the extent defendants move to strike any statutes or other legislative material from plaintiff's arsenal of exhibits, including plaintiff's exhibits 16, 17, and 20–23, defendants' motion to strike is denied, as the Court's ability to take judicial notice of such items is unquestionable.[53]

■ Second, with respect plaintiff's exhibits 4, 5, and 6, copies of a tribal certificate of title form, a sample tribal license plate, and the Reciprocity Agreement with the State of Minnesota, respectively, the affidavit of Mickey Martinez attests to their authenticity and identification. Ms. Martinez is the Motor Vehicle Registrar for the Nation and as her supplemental affidavit (Pl.Ex. 44) makes clear, she has personal knowledge of and is competent to testify as to the authenticity of exhibits 4, 5, and 6. Further, the affidavit of Steve Ortiz (Pl.Ex. 43), the tribal Secretary of the Prairie Band Potawatomi Nation, identifies and attests to the authenticity of plaintiff's exhibit 6. Additionally, Ortiz, as the custodian of all official documents of

**51.** Defendants object to portions of the Jon Boursaw affidavit for the same reasons they objected to Martinez's affidavit. The Court rejects defendants' objections for substantially the same reasons stated above. The Court finds, thereby eliminating many of defendants' complaints, that Mr. Boursaw, as the executive director of the Prairie Band Potawatomi Nation's tribal government is competent to testify to matters involving the governmental functions of the Nation, the activities of the Nation's members, and the facilities available to members on the reservation. Mr. Boursaw's affidavit avers that he is familiar with the governmental functions of the Nation and that all directors of the various tribal government departments report to him.

**52.** Mickey Martinez swore to, identified and authenticated exhibits 7–13 through her supplemental affidavit (Pl.Ex. 44).

**53.** *See United States v. Coffman,* 638 F.2d 192, 194 (10th Cir.1980). This ruling applies to plaintiff's exhibits 1, 2, 16, 17, 20–23, and 25. To the extent it is questionable whether the Court can take judicial notice of plaintiff's exhibit 2, Title 17 of the Tribal Code, the Court finds the affidavit of Steve Ortiz, Exhibit 43, cures any authentification and identification problems.

the Nation, including exhibit 6, is clearly competent to testify.

For the reasons discussed above and because the Court does not rely on evidence that does not comply with Federal Rule of Civil Procedure 56(e) or D.Kan Rule 56.1(d), defendants' motion to strike is denied.

## IV. DISCUSSION

### A. Jurisdiction and The Eleventh Amendment

■ The Eleventh Amendment grants states sovereign immunity from suits in federal court brought by the state's own citizens, citizens of another state, citizens of a foreign state, suits by other sovereigns and suits by an Indian tribe.[54] In *Ex parte Young*,[55] the Supreme Court created a legal fiction, circumventing Eleventh Amendment immunity for suits seeking injunctive and declaratory relief against state officers sued in their official capacity, to enjoin an alleged ongoing violation of federal law.[56] Defendants have alleged both in their motion to dismiss and in their motion for summary judgment that *Ex parte Young* may not be used to overcome the State's Eleventh Amendment sovereign immunity. Specifically, defendants allege that plaintiff has failed to allege an ongoing violation of federal law and that the named defendants are not connected to the enforcement of the Kansas motor fuel act. As explained below,

the Court disagrees with defendants' contentions and accordingly, their motion to dismiss and motion for summary judgment shall be denied as to this issue.

In their motion to dismiss, defendants contend that the *Ex parte Young* doctrine is inapplicable because plaintiff has failed to allege an ongoing violation of federal law. To that end, defendants allege that the allegations contained in plaintiff's complaint are "wholly insubstantial and frivolous." Remarkably, in affirming this Court's issuance of a preliminary injunction, the Tenth Circuit found exactly the opposite of what defendants argue here today. On appeal from this Court's issuance of a preliminary injunction, defendants argued that the Court lacked subject matter jurisdiction because plaintiffs failed to raise a "colorable federal claim." Like defendants do here, they essentially argued before the Tenth Circuit that a claim is colorable only when it must succeed on the merits. In rejecting defendants' arguments, the court found that plaintiff made a colorable claim in alleging that under the Indian Commerce Clause and the Kansas Act for Admission the state is required to extend recognition to the motor vehicle registrations and titles issued by the Nation. The court noted that plaintiff's claims were not "wholly insubstantial and frivolous in light of the various Supreme Court cases in which the validity of state motor vehicle laws as applied to tribes and their members was challenged on similar grounds."[57]

**54.** *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991); *Principality of Monaco v. Mississippi*, 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282 (1934); *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

**55.** 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

**56.** *Ex parte Young*, 209 U.S. at 155–56, 28 S.Ct. 441; *see also Alden v. Maine*, 527 U.S. 706, 747–48, 119 S.Ct. 2240, 144 L.Ed.2d 636

(1999) (affirming the continuing validity of *Ex parte Young*).

**57.** *Prairie Band*, 253 F.3d at 1240 (citing *Oklahoma Tax Comm'n v. Sac and Fox Nation*, 508 U.S. 114, 127, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993); *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 162–64, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980); *Moe v. Confederated Salish & Kootenai Tribes of the Flathead Reservation*, 425 U.S. 463, 480–81, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976)).

**1182**

■ Once again, defendants' motion to dismiss is replete with arguments going to the merits of plaintiff's claims. Defendants' arguments are simply irrelevant in determining whether plaintiff has *alleged* an ongoing violation of federal law. This is especially true in light of the fact that the Tenth Circuit has already decided that plaintiff has asserted a colorable federal claim in this case. For these reasons, the Court declines to assess the merits of plaintiff's claims in deciding defendants' motion to dismiss. Instead, the Court finds plaintiff has sufficiently alleged an ongoing violation of federal law to satisfy the requirements of *Ex parte Young*.

■ In addition, defendants' motion for summary judgment asserts that plaintiff may not bring an *Ex parte Young* action because the named defendants do not have a "special connection" to the unconstitutional act or conduct complained of. Defendants correctly note that those state officials being sued in an *Ex parte Young* action must have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.[58] Plaintiff has established the defendants' demonstrated willingness to enforce the state laws at issue. The Court notes that all of the named defendants have stipulated that they have taken the position that tribally issued titles and registrations are not legally recognized in the State of Kansas.[59]

■ Defendants argue, however, that none of the defendants has the required connection to the enforcement of the state laws at issue. Contrary to defendants' argument, the defendants do not need to have "special connection" to the enforcement of the disputed state laws for an *Ex parte Young* action to proceed. The Supreme Court, in *Ex parte Young* stated that "[t]he fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the important and material fact . . . ."[60]

■ Plaintiff has established that the named defendants have some connection with enforcement of the state laws at issue, satisfying the *Ex parte Young* requirement. Defendant Walker, as the Director of Vehicles, administers the Department of Revenue's division of vehicles pursuant to Kansas Statutes Annotated § 75–5110, supervises vehicle reciprocity matters under Kansas Statutes Annotated § 75–5116, and manages vehicle registrations and titles. Defendant Wagnon, as the Secretary of Revenue, supervises the entire Department of Revenue, including defendant Walker, and is responsible for enforcing the position that the Nation's titles and registrations are invalid in the State of Kansas. And, defendant Seck, as the Superintendent of the Kansas Highway Patrol, is responsible for enforcing "traffic and other laws of the state relating to highways, vehicles, and drivers of vehicles."[61] This includes enforcement of Kansas Statutes Annotated § 8–142, the statute under which those with tribally issued titles and registrations have been ticketed.[62]

**58.** *Ex parte Young*, 209 U.S. at 157, 28 S.Ct. 441 (stating that the state officer against whom an injunction is sought "must have some connection with the enforcement of the act").

**59.** *See* Pretrial Order at 3. (Doc. 143).

**60.** *Ex parte Young*, 209 U.S. at 157, 28 S.Ct. 441.

**61.** Kansas Statutes Annotated § 74–2105.

**62.** Defendants' contention that plaintiff's claims are barred because it omitted any factual contentions relating to whether the named defendants have authority to enforce either of the laws challenged in the pretrial order is equally without merit. Omitting a claim or a defense from the pretrial order is fundamentally different from omitting a factual contention defendant perceives to be necessary to plaintiff's case. The pretrial order clearly contains plaintiff's claim that the de-

Defendants seem to assert that because Walker, Wagnon or Seck cannot change state law to remedy plaintiff's concerns, but can only enforce the laws as written, they are not proper parties. This reasoning is faulty, as the essence of an *Ex parte Young* action is seeking relief against the state officials who are responsible for enforcing the violative state laws, not against state officials who drafted the violative legislation.[63]

Finally, to the extent defendants attempt to argue that plaintiff has not made the necessary showings to satisfy the Article III case or controversy requirements, the issue has already been decided by the Tenth Circuit.[64] In *Prairie Band,* the court decided live issues existed in this case making it ripe and not moot.[65] The issues pending—namely whether the state must recognize motor vehicle registrations and titles issued by the Nation [66]—are still present in this litigation and have not become moot. Further, the Tenth Circuit decided that plaintiff had standing to bring this case before the Court because "[t]he state's refusal to extend recognition ... causes an obvious harm to the tribe: interference with or infringement on tribal self-government." [67] Defendants continue to refuse to recognize tribal registrations and titles and therefore, defendants' motion for summary judgment as it applies to jurisdictional issues is denied.

## B. Tenth Amendment

Citing the Supreme Court decisions *New York v. United States* [68] and *Printz v. United States,*[69] defendants argue that granting the relief requested by plaintiff would be a violation of the Tenth Amendment.[70] *New York* and *Printz* stand for the proposition that Congress cannot force states to enact or enforce

---

fendants are violating federal law by failing to recognize tribally issued registrations and titles. *See* Pretrial Order at 8. (Doc. 143). *See also Hullman v. Bd. of Trustees,* 950 F.2d 665, 667 (10th Cir.1991) (noting that the trial court has discretion to exclude from trial those *issues* and *claims* not found in the pretrial order).

**63.** The Court summarily rejects defendants' contention that this case is in substance, a suit against the State. The relief sought simply requires the named defendants to recognize tribally issued registrations and titles, or at least refrain from ticketing tribal officials and members driving tribally registered vehicles off the reservation. This is not an instance where the relief requested would be as much of an intrusion on state sovereignty as an award of money damages, creating a violation of sovereign immunity. *See Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 287, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997) (declaratory relief against the state establishing the tribe's right to quiet enjoyment to submerged lands located within the boundaries of the reservation was a functional equivalent to a quiet title action and in violation of the Eleventh Amendment); *ANR Pipeline Co. v. Lafaver,* 150 F.3d 1178, 1193 (10th Cir.1998).

Defendants' citations to cases involving tort liability are wholly unpersuasive.

**64.** U.S. Const. art. III, § 2 (requiring that judicial power be reserved for actual "cases" and "controversies"). *See also Amisub (PSL), Inc. v. State of Colorado Dep't of Soc. Servs.,* 879 F.2d 789, 794 (10th Cir.1989) (noting that if a party "does not have a legally cognizable interest in the outcome of the case, no live controversy exists-any issuing federal opinion would be purely advisory, and, as such, prohibited by Article III").

**65.** *Prairie Band,* 253 F.3d at 1241.

**66.** *Id.* at 1244 (identifying the issue in the case to be "whether the state must grant recognition to motor vehicle registrations and titles issued by the tribe").

**67.** *Id.* at 1242.

**68.** 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992).

**69.** 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997).

**70.** U.S. Const. amend. X.

federal regulatory programs.[71] But *Printz* and *New York* are easily distinguishable from the facts at hand, for here the government is not attempting to compel the state to enact or enforce a federal program.[72] Rather, plaintiff is merely asking the Court to enjoin the defendants from enforcing a *state* law that allegedly infringes on rights guaranteed to plaintiff by federal law. The Court is not persuaded by defendants' attempt to characterize the requested relief as an effort to "mandate state participation in the enforcement of a federal statutory scheme." Therefore defendants' motion for summary judgment shall be denied as to this issue.[73]

## C. Permanent Injunction

The issue presented in this case, as articulated by the Tenth Circuit, is whether the doctrines of federal preemption and Indian sovereignty act as barriers to the State's exercise of its regulatory power to title and register vehicles belonging to either the Nation or its members who reside on the reservation. Plaintiff seeks relief in the form of a permanent injunction enjoining defendants from enforcing the Kansas motor vehicle registration and titling laws in a manner that prohibits or impairs the use of titles and registrations issued by the Nation.

The burden plaintiff must carry for issuance of a permanent injunction is essentially the same as the burden for a preliminary injunction, except that the plaintiff must actually succeed on the merits.[74] So, in addition to proving success on the merits, plaintiff must demonstrate an imminent threat of an irreparable injury, that the threatened injury outweighs the harm the injunction would cause the opposing party, and that the public interest is not harmed by the injunction.[75] Of course, an injunction is appropriate only where future conduct is at issue.

> [T]he moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.[76]

As noted above, the Tenth Circuit has provided direction for this Court's evaluation of plaintiff's claims. The Court will briefly address the first three factors of the permanent injunction test and dedicate much of its discussion to determining

71. *New York*, 505 U.S. at 177, 112 S.Ct. 2408 (holding that provision of the Low–Level Radioactive Waste Policy Act requiring states to accept ownership of waste or regulate according to instructions of Congress is inconsistent with the Tenth Amendment); *Printz*, 521 U.S. at 902, 117 S.Ct. 2365 (striking down portions of the Brady Act which require state officials to conduct background checks on handgun purchasers as violative of the Tenth Amendment).

72. *See Mille Lacs Band of Chippewa Indians v. Minnesota*, 124 F.3d 904, 928, n. 44 (8th Cir.1997) (distinguishing *Printz* on the grounds that the case did not involve a federal law commanding state regulation).

73. *See Mille Lacs Band*, 124 F.3d at 928 (noting that "there is no question that federal courts have the power to order state officials to comply with federal law").

74. *See Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *University of Texas v. Camenisch*, 451 U.S. 390, 392–94, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981).

75. *Elam Constr., Inc. v. Regional Transp. Dist.*, 129 F.3d 1343, 1346–47 (10th Cir. 1997); *Kansas Health Care Ass'n, Inc. v. Kansas Dept. of Soc. and Rehabilitation Servs.*, 31 F.3d 1536, 1542 (10th Cir.1994).

76. *Metzler v. IBP, Inc.*, 127 F.3d 959, 963 (10th Cir.1997) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)).

whether under the balancing of interests test, plaintiff is entitled to judgment.

### 1. Irreparable Harm

██ The Court must first decide whether plaintiff will be subject to irreparable harm if a permanent injunction is not issued. As noted by the Tenth Circuit in *Prairie Band*, "irreparable harm is often offered when 'the injury can[not] be adequately atoned for in money,' or when 'the district court cannot remedy [the injury] following a final determination of the merits.' " [77] The Court finds that without an injunction, plaintiff will suffer irreparable harm.

First, the Court notes that motor vehicle registration and titling is a traditional government function.[78] The threat of continued citation by the State poses a significant threat to the plaintiff's right to self-government.[79] In addition to the threat of interference with self-government, plaintiff will also suffer irreparable harm because its injury cannot be compensated with monetary damages. This is true not only because harm to the right to self-government is too abstract to assess in terms of monetary damages, but also because the State's Eleventh Amendment immunity would preclude plaintiff from recovering money damages from the State.[80] For these reasons, the Court finds plaintiff will suffer irreparable harm if an injunction is not issued.

### 2. Balancing of Potential Harms

██ Defendants argue that the harm imposed on the State if an injunction is issued outweighs the harm plaintiff will suffer if an injunction is not issued. In particular, defendants argue that State sovereignty will be harmed and public safety will be put in a precarious position if an injunction is issued. The Court is guided by the Tenth Circuit's findings in *Prairie Band* in resolving these issues.

In *Prairie Band* the court noted that the harm posed to the Nation is greater than that posed to the State because without the injunction, the Nation's motor vehicle registration and titling efforts would be defeated.[81] As a result, plaintiff would be deprived of its right of self governance. If plaintiff is granted relief, on the other hand, the State's titling and registration program will be minimally affected. The State will be unable to give citations and/or arrest tribal members with tribally issued registrations and titles traveling outside of the reservation. Such restraint seems insignificant considering the State already recognizes tribally issued tags from other jurisdictions.

The Court is also not persuaded by defendants' assertion that the harm to public

---

77. *Prairie Band*, 253 F.3d at 1250 (quoting *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 525 (3d Cir.1976); *American Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (1980)).

78. *Id.* at 1242 (citing *Crow Tribe of Indians v. Montana*, 650 F.2d 1104, 1110 (9th Cir. 1981)). Defendants relentlessly argue that automobile licensing and registration is not traditional government function beyond the reservation boundaries and therefore plaintiff is not faced with any harm to its right to self-government. Defendants' arguments miss the mark. The real issue is whether defendants' actions interfere with plaintiff's sovereignty or

ability to self-govern to the extent that the State's actions must be preempted by federal law, when some of defendants' actions may occur off the reservation.

79. *Id.* at 1250 (citing *Seneca–Cayuga*, 874 F.2d at 716).

80. *Id.* at 1251 (citing *Kansas Health Care Ass'n Inc.*, 31 F.3d at 1543 (noting that a plaintiff's injury is irreparable when the Eleventh Amendment bars a legal remedy in damages)).

81. *Prairie Band*, 253 F.3d at 1252.

safety with the injunction, sufficiently outweighs any harm to plaintiff without the injunction. As discussed in detail below, defendants' public safety concerns are exaggerated and simply not sufficient to outweigh the importance of plaintiff's right to self-govern. Therefore, the Court finds that the threatened injury to plaintiff outweighs the harm the injunction would cause the defendants.

### 3. Public Interest

■ The Court also finds that the public interest will not be harmed if a permanent injunction is granted. In *Prairie Band*, the Tenth Circuit noted that the case of law in this circuit "suggests that tribal self-government may be a matter of public interest." [82] In *Seneca–Cayuga Tribe of Oklahoma v. Oklahoma*, [83] the Tenth Circuit held that the district court properly enjoined a pending state court action in which the State of Oklahoma sought to enjoin operation of bingo games on the plaintiff's reservation. The Court noted that "the injunction promotes the paramount federal policy that Indians develop independent sources of income and strong self-government." [84] Similarly, in this case, the Court finds that granting the injunction, and thereby allowing the Nation to proceed with its own vehicle registration and titling system, will assist the

Nation in achieving a strong self-government. The injunction will also allow the Nation to better control traffic on its reservation and presumably create a safer environment for Indians and non-Indians alike. For this reason, the Court concludes that issuance of the injunction will not harm public interest. [85]

### 4. Success on the Merits

■ To succeed on the merits of its claim, plaintiff must demonstrate that the state laws at issue are preempted by federal law or that the doctrine of Indian sovereignty in conjunction with federal preemption bars the State from enforcing its title and registration laws, as they apply to plaintiff. [86] Because of the unique status afforded to Indian affairs, "it [is] generally unhelpful to apply ... standards of preemption that have emerged in other areas of the law." [87] Instead, the body of federal case law dealing with the relationship between tribes, states and the federal government has developed a specific set of guidelines that only apply to preemption issues involving tribes. Perhaps the most important of these guidelines is the notion that "in order to find a particular state law to have been preempted by operation of federal law, [there need not be] an express congressional statement to that effect" [88]

---

82. *Id.* at 1253 (citing *Seneca–Cayuga*, 874 F.2d at 716.).

83. 874 F.2d 709 (10th Cir.1989).

84. *Id.* at 716.

85. To the extent defendants argue that the public's interest in its safety will be harmed if the injunction is granted, defendants' arguments are rejected. As noted below, defendants' purported public safety concerns are not as serious as defendants purport them to be.

86. *Prairie Band*, 253 F.3d at 1254 (noting that there are "at least three possible barriers to the state's assertions of authority with respect

to motor vehicle registration," 1) congressional enactments demonstrating "congressional concern with fostering tribal self-government may preempt the state registration and titling laws, 2) treaties between the Nation and the United States may preempt the state laws, and 3) the doctrine of Indian sovereignty "might act as a bar to state regulatory authority").

87. *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980).

88. *Id.* at 144, 100 S.Ct. 2578.

or a treaty containing an express preemptive statement.[89] "Preemption in the context of federal Indian law is also unique in that it rests 'principally on a consideration of the competing interests at stake'—i.e. tribal, federal, and state interests."[90]

■■■ The doctrine of Indian sovereignty—"the right of reservation Indians to make their own laws and be ruled by them"—may also work "in tandem" with federal preemption as a barrier to the exercise of state power.[91] This doctrine provides an essential "backdrop against which the applicable federal treaties and statutes must be read."[92] Therefore, the Court will consider the doctrine of Indian sovereignty in connection with the preemption analysis and not as a separate barrier to the state's regulatory authority.

It is with these principles in mind that the Court sets out to balance the respective state, federal and tribal interests.[93]

### a. Tribal Interests and Federal Interest

■■■ The federal government has a firm policy in favor of "promoting tribal self-sufficiency and economic develop-

ment."[94] Other than this general overarching policy, there is no other federal law that absolutely requires the Court to give broad preemptive effect to the tribal ordinance in question. As noted above, despite the apparent absence of an obvious preemptive federal law, the Court's inquiry does not end. Indeed, the area of Indian preemption is unusual in that no express federal statement is necessary to preempt a state law.[95]

Although there is no federal law having an obvious preemptive effect on defendants' efforts to enforce its titling and registration laws against plaintiff, several congressional enactments are indicative of the federal policy promoting tribal self-sufficiency, self-government and economic development, including the following: Indian Reorganization Act of 1934, 25 U.S.C. §§ 461–479; Indian Financing Act of 1974, 25 U.S.C. §§ 1451–1543; and the Indian Self–Determination and Education Assistance Act of 1975, 25 U.S.C. §§ 450–458e.[96] Although these enactments do not speak directly to tribal vehicle titling and registration ordinances, such ordinances are a by-product of the federal policy toward self-determination, self-sufficiency and self-government.[97] Thus, while there is no

**89.** See Prairie Band, 253 F.3d at 1253 (citing McClanahan v. State Tax Comm'n, 411 U.S. 164, 174–75, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973)).

**90.** Id. (quoting New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983)).

**91.** Id. at 1254.

**92.** McClanahan, 411 U.S. at 172, 93 S.Ct. 1257.

**93.** In Prairie Band, the Tenth Circuit specifically rejected the Ninth Circuit's position that the balancing of interests test is inapplicable when the activity sought to be regulated by the state takes place off reservation land. See Prairie Band, 253 at 1255 n. 9. Compare Cabazon Band of Mission Indians v. Smith, 249 F.3d 1101 (9th Cir.2001). Consequently, the defendants' assertion that balancing is unnec-

essary because some of the activity at issue in this case takes place off the reservation, is rejected.

**94.** White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980).

**95.** Crow Tribe of Indians v. Montana, 650 F.2d 1104, 1109 (9th Cir.1981).

**96.** See White Mountain, 448 U.S. at 143, 100 S.Ct. 2578 (noting that the tradition of Indian sovereignty is "reflected and encouraged in a number of congressional enactments demonstrating a firm federal policy of promoting tribal self-sufficiency and economic development.")

**97.** Queets Band of Indians v. Washington, 765 F.2d 1399, 1407 n. 6 (9th Cir.1985) (citing White Mountain, 448 U.S. at 143, 100 S.Ct. 2578).

federal legislation addressing tribal vehicle registrations and titling, there is an obvious federal interest in the Nation's right to self-government.

 As a "backdrop" to the Court's balancing endeavor, it must consider the doctrine of Indian sovereignty. To that end, it is noted that there can be no question that the Nation has a right to "make their own laws and be ruled by them." [98] This doctrine "specifically prohibits state action that impairs the ability of a tribe to exercise traditional government functions" such as vehicle registration.[99] Motor vehicle registration and titling is a traditional governmental function and the state's interference with the Nation's pursuit in this regard is considered interference with or infringement on tribal self-government.[100] Because the issue at hand involves a traditional government function, the tribal and federal interests are heightened. Not only does the Nation have an interest in making its own laws and being ruled by them, the federal government has an interest in seeing that the Nation strives toward self-sufficiency.[101] The Court finds that the Nation's efforts to implement tribal registration and titling laws work toward maximizing these federal and tribal interests.[102]

Defendants argue that the Nation has absolutely no interest in the right to self-governance once a tribal official or member drives off the reservation. The Court disagrees. The Supreme Court has noted that in some cases the extent of tribal sovereignty clearly goes beyond simple geographical limits to include the tradition of Indian sovereignty over the reservation and its members.[103] This principle holds especially true when there are issues going

---

**98.** *Washington v. Confederated Tribes of Colville,* 447 U.S. 134, 156, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980) (quoting *Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959)). *See also White Mountain Apache v. Arizona,* 649 F.2d 1274 (9th Cir.1981).

**99.** *Crow Tribe of Indians v. Montana,* 650 F.2d at 1110 (citing *Red Lake Band of Chippewa Indians v. Minnesota,* 311 Minn. 241, 248 N.W.2d 722 (1976)).

**100.** *Prairie Band,* 253 F.3d at 1250. *See also Queets Band of Indians,* 765 F.2d at 1403 (concluding that "Indian tribes possess the sovereign authority to license and register tribal vehicles.")

**101.** *See New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 335, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983) (noting that both Indian tribes and the federal government "are firmly committed to the goal of promoting tribal self-government . . . .") (citing Indian Financing Act of 1974, 25 U.S.C. § 1451 *et seq.)* ("It is hereby declared to be the policy of Congress . . . to help develop and utilize Indian resources, both physical and human, to a point where the Indians will fully exercise responsibility for the utilization and management of their own resources and where they will enjoy a standard of living from their own

productive efforts comparable to that enjoyed by non-Indians in neighboring communities."; Indian Self–Determination and Education Assistance Act of 1975, 25 U.S.C. § 450 *et seq.;* Indian Reorganization Act of 1934, 25 U.S.C. § 461 *et seq.;* Indian Civil Rights Act of 1968, 25 U.S.C. § 1301 *et seq.*).

**102.** The Court summarily rejects defendants' assertion that the federal government's interests actually lie in state regulation of vehicle registration and titling matters, not in tribal self-government. The Court acknowledges there are several federal regulations that address state regulation of highways. *See e.g.,* 23 U.S.C. § 402. These statutes, however, do not preclude tribal vehicle registration and titling enactments. *See County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 247–48, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (noting that if Congress intends to abrogate Indian rights, it must do so expressly). Instead, these statutes mostly limit state control of highways by making federal funding contingent upon the State's enactment of certain safety requirements.

**103.** *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980).

to tribal self-governance.[104] In this case, the Nation did not enact a tribal code merely to regulate registrations and titles for vehicles belonging to the Nation and its members. Instead, the Nation enacted a comprehensive code meant to apply to all vehicles and occupants of vehicles coming and going from the reservation. The stated purposes of the PBMVC included: 1) tribal control and regulation of motor vehicle traffic on the reservation, 2) orderly registration and licensing of vehicles owned by tribal members and located on roads and highways within the reservation, 3) assisting law enforcement officers in identifying owners of the vehicles, 4) prevention of fraudulent transfers, theft and conversion, 5) providing revenue to the Nation through taxation and fees, and 6) allowing for the orderly transfer of title and other transactions involving vehicles. The fact that tribal members and officials are occasionally compelled to leave the reservation is an "ancillary consequence" to the ultimate fact that the Nation is attempting to achieve the above stated goals.[105]

Issues similar to those presented in this case have been decided by at least two other courts. In *Queets Band of Indians v. Washington,*[106] the Ninth Circuit determined that two tribes in the State of Washington, the Quinault Indian Nation (Queets) and the Muckleshoot Band of Indians (Muckleshoots), had the inherent authority to register and license tribal vehicles. Consequently, the court found tribal ordinances requiring tribally issued titles and registrations were sufficiently preemptive to require the state to recognize tribal licensing and registration power pursuant to the State's reciprocity provisions. After examining the relevant state, federal and tribal interests, the court stated:

> [T]he tribes' exercise of sovereignty in licensing and registering their respective tribal vehicles carries with it sufficient "preemptive" force to require that the state of Washington afford reciprocal recognition. "The principle of tribal self-government, grounded in notions of inherent sovereignty and in congressional policies, seeks an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other." We believe that we have reached the best accommodation between those interests.[107]

Although the court's decision was later withdrawn at the request of the parties in anticipation of legislation that would render the controversy moot, the Court finds the Ninth Circuit's reasoning persuasive.

The Supreme Court of Minnesota has also addressed the issues presented by this case. In *Red Lake Band of Chippewa Indians v. State,*[108] the tribal council for the Red Lake Band of Chippewa Indians enacted a motor vehicle licensing and registration ordinance. The State of Minnesota refused to recognize the validity of tribally issued registrations under its reciprocity statute and informed the tribal council that members who drove on roads outside the reservation in vehicles without Minnesota registrations and plates would be subject to arrest. Upon judicial review of the state's position, the Minnesota Supreme Court first determined that adoption of the motor vehicle registration ordinance was an appropriate exercise of the tribe's powers of self-government.[109] The

---

104. *White Mountain,* 448 U.S. at 144–45, 100 S.Ct. 2578.

105. *Prairie Band,* 253 F.3d at 1255.

106. 765 F.2d 1399 (1985).

107. *Queets,* 765 F.2d at 1408 (quoting *Colville,* 447 U.S. at 156, 100 S.Ct. 2069).

108. 248 N.W.2d 722 (Minn.1976).

109. *Red Lake Band,* 248 N.W.2d at 727 (noting that the state "should not, in the absence

court then determined that issuance of tribal registrations would be of little value if the state refused to recognize their validity beyond the territorial limitations of the reservation.[110] The state's refusal to recognize the tribal registrations would in effect, nullify the tribal ordinance. The court ultimately found that such a result unjustifiably interfered with the internal government of the Red Lake Band.

Similarly, in the case before the Court, the State's refusal to recognize registrations and titles issued by the Nation is an affront to the Nation's lawful and rightful attempt to self-govern. If an injunction is not issued, the Nation's motor vehicle code will be effectively defunct.

Having determined that the federal and tribal interests favor the Nation's right to enact and enforce its own vehicle registration and titling laws, the Court now turns to assessing the State's interests in enforcing its vehicle registrations and titling laws.

### b. State Interests

 Defendants argue that the State's interests in regulating the registration and titling of all vehicles driven on state highways overcomes any interest the Nation may have in tribal registration and titling. Defendants primarily argue that because persons driving tribally registered and ti-

tled vehicles will inevitably need to leave the reservation, the State's sovereignty interests and public safety interests tip the balance in favor of the State. There can be no doubt that state authority over Indians is more extensive when the activity in question occurs off the reservation.[111] Even so, state authority can be preempted if it "interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." [112]

In *Mescalero Apache Tribe v. Jones*,[113] the Supreme Court determined that "absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law, otherwise applicable to all citizens of the State." [114] Clinging to this language, defendants contend that beyond the reservation, plaintiff simply has no interest in tribal registration and titling. Even assuming that the State's policies regarding tribal registrations and titling are "nondiscriminatory," *Mescalero* may be distinguished.[115]

In *Prairie Band,* the court cautioned that *Mescalero* is not necessarily dispositive as to the issues before the Court. First, the court stated that it reads *Mescalero* "to say that, if the tribal activity is off-reservation that fact *generally* tips the

---

of some compelling state interest, impose burdens upon persons subject to the governing authority of the Red Lake Band when such burdens will undermine the effectiveness of the Band's efforts to achieve effective self-government").

**110.** *Id.*

**111.** *Organized Village of Kake v. Egan,* 369 U.S. 60, 75, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962).

**112.** *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 334, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983).

**113.** 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973).

**114.** *Mescalero,* 411 U.S. at 148–49, 93 S.Ct. 1267.

**115.** Because the Court ultimately finds that the State regulations at issue are preempted, the Court does not reach the issue of whether defendants' policies regarding tribal registrations and titling are nondiscriminatory.

balancing test in favor of the state," but not always.[116] The court noted that this case presents a more difficult issue because the tribal activity in question involves a traditional governmental function, namely the registration and titling of motor vehicles. In *Mescalero*, on the other hand, the issue before the court was whether the State of New Mexico could collect a nondiscriminatory gross receipts tax from a ski resort owned and operated by the tribe but located off the reservation. The fact that a traditional government function is at issue in this case heightens the Nation's interests and presents a "significant counter to the state's interests," [117] thereby distinguishing *Mescalero*.

*Mescalero* can also be distinguished because the ski resort, the operation the state sought to tax, was operated exclusively off the reservation. In this case, the disputed tribal activity, tribal registration and titling of vehicles, takes place primarily on the reservation.[118] Two courts have determined that when some of the activity the state seeks to regulate takes place off the reservation, but the primary tribal conduct in question occurs on the reservation, the state's interest in regulating the conduct is less compelling. In *People v. McCovey*,[119] the California Supreme Court "was faced with that state's attempt to regulate off-reservation fish sales by individuals who were not members of the tribe. The fish in question, however, were caught on the reservation by tribal members." [120] The court distinguished *Mescalero* by noting that the activity in *Mescalero* occurred entirely off the reservation. After balancing the state, tribal and federal interests, the court concluded that the state was preempted from regulating the off-reservation sale of fish caught on the reservation by tribal members.

Similarly, the Ninth Circuit decided in *In re Blue Lake Forest Products, Inc.*,[121] that state law was preempted where the "essential conduct"—severance of timber and its removal without proper compensation—occurred on the reservation. The court noted that the "Indian enterprise at the heart of [the] dispute—the timbering lands—is located on, not off, the reservation," and then determined that federal and tribal interest preempted the application of state law and thus barred state regulation.[122]

Both *Blue Lake* and *McCovey* are instructive regarding the issues presented in this case because the primary activity in question here—tribal registration and titling of vehicles—occurs within the boundaries of the reservation. Indeed, the only instance when tribal registrations become problematic is when a tribal member or official is required to leave the reservation. Accordingly, the Court finds that the tribal and federal interests are heightened because the conduct at the heart of this dispute takes place on the reservation.

Defendants also argue that the State's interest in public safety outweighs any legitimate right plaintiff has in tribal titling and registration. Defendants' primary concern is that registration information for tribal members is not accessible from any computer databases by law enforcement creating a potentially dangerous situation for officers. But, as noted in *Prairie Band*, defendants' safety concerns are

**116.** *Prairie Band*, 253 F.3d at 1255 n. 9.

**117.** *Id.* at 1256.

**118.** *Id.* (citing *People v. McCovey*, 36 Cal.3d 517, 205 Cal.Rptr. 643, 685 P.2d 687 (1984)).

**119.** 685 P.2d at 687.

**120.** *Id.* at 697.

**121.** 30 F.3d 1138, 1141 (9th Cir.1994).

**122.** *Id.*

largely exaggerated.[123] The evidence in the record shows that law enforcement officers use three systems to access information about vehicles, their drivers and their passengers. Officers use the KCJIS to determine whether the registration information provided by the Department of Motor Vehicles ("DMV") matches the vehicle that has been stopped.[124] Officers also use the NLETS and NCIC systems to retrieve criminal justice information. It appears that if a vehicle, its driver or its passenger have been involved in a criminal matter they are entered into the NCIC system so that an officer may retrieve information in the event of a future confrontation.

According to the Court's review of the record, the fact that an individual has a tribally registered and titled vehicle does not prevent registration with the NCIC. The only common denominator for vehicles and persons entered in the NCIC database is contact with the criminal justice system. Also, plaintiff has averred that it has provided all pertinent tribal vehicle registration information to the Department of Revenue. Defendants have asserted that the Department of Revenue maintains DMV records which contain registration information vital to KCJIS.[125] If defendants choose to enter the information plaintiff has provided them into the DMV database, tribal registration and titling information will apparently become available in KCJIS. This hardly seems difficult as the Department of Revenue, and in turn the DMV, have all the information required to enter a small number of tribally registered vehicles into its system.[126]

Defendants' safety and sovereignty concerns are also slightly diminished because Kansas officials have once before been forced to recognize tribal license plates. In *State v. Wakole*,[127] the Kansas Supreme Court ruled that under Kansas Statutes Annotated § 8–138a, the State is required to recognize license plates issued by the Sac and Fox of Oklahoma. Although the court's rationale for forcing Kansas officials to recognize the tribal plates in that case is much different than the rationale of this Court, it stands to reason that Kansas officials can and have dealt with issues arising from recognition of tribal plates. Indeed, the registration information defendants claim is essential to public safety is not available for vehicles bearing Sac and Fox of Oklahoma tribal tags.

---

123. *Prairie Band*, 253 F.3d at 1251–52. In determining that defendants may have exaggerated safety problems posed by tribal registrations and titles, the court noted the following:

 (1) Master Trooper Gary Thiessen of the Kansas Highway Patrol stated outright in an incident report that "this issue was not one of safety, but one of revenue," Aplts' App. vol. III, at 118 (Kansas Highway Patrol Combined Incident Report, dated Aug. 12, 1999); (2) vehicles with tribal registrations and titles were in use for several months without any safety-related incident; (3) Jackson County Attorney Michael A. Ireland did not seem troubled by the safety issue, voluntarily adopting a policy under which no citations would be issued to the tribe or its members until a meeting could be held, see *id.*, at 110 (affidavit of Mr.

Ireland); (4) the safety issue did not appear to worry the state of Minnesota, which granted recognition to the tribe's registrations and titles; and (5) in spite of its concern about safety, Kansas still recognizes the registrations and titles of tribes residing outside the state.

124. The Department of Revenue maintains the DMV registration information.

125. It appears that the State of Kansas provides all registration information to NLETS.

126. *See Prairie Band*, 253 F.3d at 1252 (noting that "Federal Indian law is replete with examples in which state law has had to accommodate tribal sovereignty . . . .")

127. 265 Kan. 53, 959 P.2d 882 (1998).

Defendants' sovereignty arguments are also diluted because contrary to defendants' assertions, plaintiff does not seek to nullify state registration laws. Instead, it seeks an injunction requiring the State to recognize their licensing and titling authority through the application of the State's reciprocity statute. In balancing the threat to the State's sovereignty interests with the threat to the Nation's sovereignty interests, the Court finds that the balance tips in favor of the Nation. The Court's decision rests primarily on the fact that if the State does not recognize tribal registrations and titles, there will be no tribal registrations and titles and the Nation will be unable to effectively pursue the goal of self-government. The State, on the other hand, will simply have to expand its recognition of tribal registrations to those issued by the Prairie Band of Potawatomi Indians.

Defendants also assert that consumer protection will be at stake if plaintiff is allowed to proceed with registering and titling vehicles. In particular, defendants complain that PBMVC contains no provisions for inspections of certain non-highway and salvage vehicles, otherwise known as "special circumstance" vehicles. Defendants further assert that only certain individuals in the Kansas Highway Patrol have the expertise to conduct inspections of special circumstance vehicles.

But, the PBMVC does not provide for the registration or titling of these special circumstance vehicles.[128] Plaintiff concedes that the PBMVC also does not provide for the inspection of these special circumstances vehicles; and asserts that the Nation would be compelled to request an inspection by the highway patrol, of any special circumstance vehicle allegedly involved in a crime. Thus, any consumer protection concerns about special circumstances vehicles are not implicated, for the inspection of special circumstances vehicles is not affected by the PBMVC.[129]

In addition to the issues addressed above, in *Prairie Band,* the Tenth Circuit advised the parties to consider whether the Supreme Court cases *Washington v. Confederated Tribes of Colville,*[130] and *Oklahoma Tax Commissioner v. Sac and Fox Nation,*[131] have any application to the facts before the Court. Remarkably, neither party adequately briefed the applicability of these cases. Despite that fact, the Court feels compelled to determine whether the dictates set forth in *Colville* and *Oklahoma Tax Commission* are useful in the resolution of this case.

In *Colville,* the Supreme Court struck down state motor vehicle taxes, referred to as "excise taxes," imposed on vehicles owned by tribes or their members, used both on and off the reservation.[132] In *Oklahoma Tax Commission,* the Supreme

---

**128.** *See* PBMVC § 17–10–3(D) which states, "Salvage or non-highway registrations or titles shall not be issued by the Nation or used by the Registrar as a basis for issuing regular tribal registrations or titles."

**129.** *See* PBMVC § 17–10–3(C) (calling for inspection procedures in accordance with "generally accepted inspection practices commonly utilized by other jurisdictions in the United States" and in accordance with the policies of the American Association of Motor Vehicle Administrators and the National Highway Traffic Safety Administration).

**130.** 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980).

**131.** 508 U.S. 114, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993).

**132.** *Colville,* 447 U.S. at 163–64, 100 S.Ct. 2069. *See also Moe v. Salish & Kootenai Tribes,* 425 U.S. 463, 480–81, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) (holding that Montana's personal property tax could not validly be applied to motor vehicles owned by tribal members who reside on the reservation).

Court struck down the State of Oklahoma's motor vehicle excise tax and registration fees as they applied to tribal members residing in "Indian country." [133] In both cases, however, the Court left open the possibility of a different result had the state tailored its tax to the amount of actual off-reservation use. The Court finds that the application of *Colville* and *Oklahoma Tax Commission* to the facts of this case is limited. The facts in the current case present no opportunity to specifically tailor vehicle registration and titling to off-reservation use. Tribal registration and titling is an all-or-nothing proposition. The PBMVC requires an individual applying for a tribally issued title to surrender all other certificates of title issued by any other sovereign. [134] Without a tribally issued title, an individual may not register his or her vehicle under the PBMVC. [135]

The *Colville* Court also reviewed a tribal cigarette tax imposed on non-Indian purchases on the reservation. The Colvilles contended that their right to tax transactions occurring on their reservation eliminated the state's power to collect its tax. [136] The Court rejected this argument because it found that the state had not infringed on the right of tribal self-government. [137] The Court noted that while tribes have an interest in raising revenues for essential governmental programs, "that interest is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes . . . ." [138] The Court determined that the tribe was essentially marketing an exemption from state taxes to non-Indians. [139] The Court's holding in this regard has essentially no application to the facts at hand. There has been no allegation that the Nation is marketing an exemption to non-Indians. Instead, this case deals only with the Nation's ability to provide a vehicle registration and titling mechanism to its own government and to its members.

**c. Preemptive Effect**

■ The Court finds that contrary to defendants' assertions, the on-or-off reservation distinction is not the only factor the Court must look to in determining whether defendants' registration and titling laws are preempted as they apply to properly registered and titled tribal vehicles. Although plaintiff's activity off the reservation generally would tip the scales in favor of the State, the Court finds that in this matter, where a traditional government function is involved, where defendants have already been forced to recognize other tribally registered and titled vehicles, and where the off-reservation is ancillary to an important on-reservation activity, the tribal and federal interests outweigh the State's interests.

The Court finds that defendants' enforcement of Kansas Statutes Annotated § 8–142 as it applies to vehicles bearing registrations and titles issued by the plaintiff undermines the federal policy encouraging tribal self-government. Additionally, the Court finds that the state's articulated interests do not outweigh the Tribe's interest in maximizing the goal of self-government in the form of a compre-

---

133. *Oklahoma Tax Comm'n*, 508 U.S. at 127–28, 113 S.Ct. 1985.

134. PBMVC § 17–10–19(A)(8).

135. PBMVC § 17–10–4(D).

136. *Colville*, 447 U.S. at 154, 100 S.Ct. 2069.

137. *Id.* at 156–57, 100 S.Ct. 2069.

138. *Id.* at 156–57, 100 S.Ct. 2069.

139. *Id.* at 157, 100 S.Ct. 2069. *See also Moe*, 425 U.S. at 483, 96 S.Ct. 1634 (upholding state cigarette tax on Indian smokeshop operators because legal incidence of tax fell on non-Indian purchasers).

hensive vehicle titling and registration system. This is especially true in light of the fact that Kansas is already recognizing out-of-state tribally issued registrations pursuant to its reciprocity statute. Thus, the Court finds that defendants' enforcement of State titling and registrations laws as they apply to tribal members and officials who have properly issued tribal titles and registrations is preempted by federal law.[140]

## V. CONCLUSION

The Court finds that no genuine issues of material facts exist in this case and that plaintiff is entitled to judgment as a matter of law. In so ruling, the Court finds that this is a proper *Ex parte Young* action and therefore the State is not entitled to Eleventh Amendment immunity. The Court also finds that granting the relief requested by plaintiff does not mandate state participation in the enforcement of a federal statutory scheme and therefore the Tenth Amendment has not been offended. Finally, the Court finds, after balancing state, federal and tribal interests, defendants are preempted from enforcing state title and registration laws against plaintiff and any person who operates or owns a vehicle properly registered and titled under PBMVC § 17-10-1 *et seq.*

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 154) is granted. Defendants are permanently enjoined and restrained from further application and enforcement of the Kansas motor vehicle registration or titling laws against the plaintiff and any persons who operate or own a vehicle properly registered and titled under PBMVC § 17-10-1 *et seq.* This order applies to vehicles driven both on and off of plaintiff's reservation. This injunction is not meant to

have any effect on Kansas traffic laws that do not deal directly with vehicle registration, vehicle license plates, and motor vehicle titles.

**IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss (Doc. 144) is denied, Defendants' Motion to Strike (Doc. 161) is denied and Defendants' Motion for Summary Judgment (Doc. 146) is denied, and Plaintiff's Motion to File Response to Motion to Strike Out of Time (Doc. 170) is granted.

---

140. Due to the Court's preemption analysis, the Court does not reach the question of whether defendants' refusal to extend reci-

procity to plaintiff's registrations and titles violates the Kansas Act for Admission.